**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

MESA UNDERWRITERS SPECIALTY
INSURANCE COMPANY,

          Plaintiff,

v.

LOU BUDKE'S ARROW FINANCE
COMPANY d/b/a ARROW FINANCE
COMPANY and RICHARD KYLES,

          Defendants.

Case No. 4:24-cv-692

## COMPLAINT FOR DECLARATORY JUDGMENT

**COMES NOW** Plaintiff Mesa Underwriters Specialty Insurance Company ("Mesa"), by and through its undersigned counsel, and states as follows for its Complaint for Declaratory Judgment:

### INTRODUCTION

1.     This action seeks a declaratory judgment that Defendant Lou Budke's Arrow Finance Company d/b/a Arrow Finance Company ("AFC") is not entitled to defense or indemnity under the terms of any Mesa policy of garage liability insurance issued to AFC in connection with an underlying lawsuit styled *Lou Budke's Arrow Finance Company v. Richard Kyles*, which is proceeding in St. Louis County Circuit Court in Case No. 15SL-AC29334-01 ("Underlying Lawsuit").

### THE PARTIES

2.     At all relevant times, Mesa was a New Jersey-incorporated company authorized to issue policies of insurance in Missouri.  Mesa's principal place of business was in Branchville, New Jersey at all relevant times.  Mesa issued policies of insurance to AFC, the coverage of which is the subject of this action for declaratory judgment.

3.     At all relevant times, Arrow Finance Company was a fictitious name for Lou Budke's Arrow Finance Company and was a Missouri corporation with its principal place of business in St.

Louis, Missouri. AFC may be served through its registered agent, Andrew L. Budke, at 3528 Hampton Avenue, St. Louis, Missouri 63139.

4. At all relevant times, Richard Kyles ("Kyles") was an Illinois citizen and may be served at 1701 S. 12th Street, Mount Vernon, IL 62864. Kyles is the lead plaintiff in the Underlying Lawsuit.

## JURISDICTION AND VENUE

5. The Court has jurisdiction over the subject matter pursuant to 28 U.S.C. §§ 1332 and 2201. This action involves a declaratory judgment between citizens of different states. The amount in controversy also exceeds $75,000, exclusive of interest and costs, because Kyles alleges that the class damages exceed $4,850,000. (Joint Motion for Preliminary Approval of Class-Action Settlement and its Exhibit 1, the Class Action Settlement Agreement Release, in Case No. 15SL-AC29334-01, collectively attached as **Exhibit A**).

6. Venue is proper because Mesa's policies of insurance were delivered in Missouri for the benefit of the St. Louis, Missouri-based insured therein and because the subject matter of the Underlying Lawsuit involves a citizen of St. Louis, St. Louis County, Missouri and transactions that took place in St. Louis County, Missouri.

## FACTUAL BACKGROUND

7. AFC originally filed its Petition for Breach of Contract against Kyles on November 18, 2015 in the lawsuit bearing Case No. 15SL-AC29334, which was filed in the Associate Circuit Court of St. Louis County ("Arrow Petition"). (*See* **Exhibit B**, AFC Petition and its Exhibits, the Retail Installment Sales Contract and Delinquency Notices, collectively attached). In its Petition, AFC alleged that on April 9, 2015, Kyles entered a Retail Installment Sales Contract whereby he purchased an automobile from AFC; that Kyles breached the contract; and that AFC was entitled to monetary damages as a result of Kyles' breach.

2

8.     On August 29, 2016, the Associate Circuit Court of St. Louis County entered an Order by which:

    a.    The Court deemed filed as of August 4, 2016 Kyles' First Amended Answer and Counterclaim against AFC.  In his Counterclaim, Kyles asserted class-action claims against AFC on behalf of himself and other similarly situated consumers, alleging that AFC breached various state statutes and the Uniform Commercial Code ("UCC") arising out of AFC's repossession of automobiles and subsequent collection efforts from customers that had breached their Retail Installment Sales Contracts for the purchase of automobiles from AFC.

    b.    The Court deemed that Kyles' class action Counterclaim exceeded the jurisdictional limits for Associate Circuit Court and certified the case for transfer to the Circuit Court of St. Louis County.  Upon its transfer to the Circuit Court of St. Louis County, the case was assigned Case No. 15SL-AC29334-01.

9.     On July 21, 2017, Kyles filed the Second Amended Answer and Counterclaim (hereinafter the "Counterclaim") in Case No. 15SL-AC29334-01, which remains the operative pleading in the case.  (*See* **Exhibit C**, Counterclaim).

10.     Kyles' Counterclaim "is a consumer class action against [AFC], and its predecessors or successors, seeking relief to redress an unlawful pattern of wrongdoing followed by [AFC] regarding collection, enforcement, and disposition of collateral, and collection of alleged deficiencies."  (*See* **Exhibit C**, Counterclaim, ¶ 1).

11.     Kyles alleges that he and others similarly situated, i.e., the "Class," signed consumer credit contracts with AFC for the purchase of a motor vehicle. (*See* **Exhibit C**, Counterclaim, ¶¶ 11,

44, 45).  Kyles further alleges a subclass of individuals who resided in Missouri entered consumer credit contracts with AFC, called the "Missouri Subclass."  (*See* **Exhibit C**, Counterclaim, ¶ 47).

12.    The Counterclaim alleges two counts against AFC: Count I – Class's Claim, and Count II – Missouri Subclass' Claim.  (*See* **Exhibit C**).

13.    Kyles' Counterclaim asserts allegations on behalf of himself and others similarly situated, i.e., the "Class."  The Counterclaim asserts that the Class comprises all persons within the applicable statute of limitations:

    a.    who are named as borrowers or buyers on a loan or financing agreement with [AFC], assigned to [AFC] or owned by [AFC];
    b.    **whose loan or financing agreement was secured by collateral**;
    c.    **whose collateral was repossessed**, voluntarily or involuntarily; and
    d.    whose collateral was disposed.

(*See* **Exhibit C**, Counterclaim, ¶ 45) (emphasis added).

14.    Kyles' Counterclaim asserts allegations on behalf of himself and others similarly situated in Missouri, i.e., the "Missouri Subclass."  The Counterclaim asserts that the Missouri Subclass comprises all persons within the Class:

    a.    who obtained a Missouri Certificate of Title for a motor vehicle identifying [AFC] as the lienholder, who are named as borrowers or buyers with a Missouri address on a loan or financing agreement with [AFC], assigned to [AFC] or owned by [AFC];
    b.    **whose loan or financing agreement was secured by a motor vehicle or other collateral**;
    c.    whose motor vehicle or other collateral was repossessed, involuntarily or voluntarily; and
    d.    whose motor vehicle or other collateral was disposed.

(*See* **Exhibit C**, Counterclaim, ¶ 47) (emphasis added).

15.    Kyles alleges, on behalf of himself and the Class, that AFC's actions to enforce the consumer credit contracts related to the sale of motor vehicles violated Missouri statutes and various sections of the UCC.  Specifically, Kyles alleges:

    a.    AFC sued Kyles and the Missouri Subclass without giving the notice required

4

by RSMo. § 408.557;

    b.      AFC sent presale notices that did not comply with the UCC;

    c.      AFC violated section 408.553 of the UCC by charging interest before obtaining deficiency judgments against those in default; and

    d.      AFC sent post-sale notices that did not comply with the UCC.

(*See* **Exhibit C**, Counterclaim, ¶¶ 1-4, 26).

16.     Kyles alleges, on behalf of himself and the Class, that AFC took deficiency judgments against him and the Class, which included interest, charges, expenses, attorneys' fees, and other costs of collection that effected their deficiency balances; that AFC unlawfully collected or attempted to collect interest accruing after default and before judgment from Kyles and Missouri consumers; that AFC unlawfully collected or attempted to collect deficiency balances from Kyles and the Class; that AFC issued defective presale and post-sale notices; and that AFC maintained a practice and policy of reporting derogatory information regarding the Class to local consumer reporting agencies despite its failure to comply with the presale and post-sale requirements. (*See* **Exhibit C**, Counterclaim, ¶¶ 27-32).

17.     Kyles alleges, on behalf of himself and the Class, that the defective presale and post-sale notices were not sent with knowledge of their falsity; that AFC's reporting of false or inaccurate derogatory information on the Class members' credit reports was not done with knowledge of their falsity; that AFC did not intend to violate Chapter 408 or the UCC and did not intend injury to the class because it believed its notices were accurate, lawful and contained no misrepresentations; and, that AFC did not know the presale and post-sale notices, and its reporting of information on the class members' credit reports would violate the rights of the class members or inflict injury upon them. (*See* **Exhibit C**, Counterclaim, ¶¶ 36, 37, 40, 41).

18.     In Count I – Class's Claim, Kyles alleges that as a result of AFC's failure to comply

with the requirements of the UCC, the Class suffered actual damages, including:

    a.    loss of use of tangible property and cost of alternative transportation;

    b.    loss resulting from the inability to obtain, or increased costs of, alternative financing;

    c.    harm to credit worthiness, credit standing, credit capacity, character, and general reputation;

    d.    harm caused by defamation, slander and libel;

    e.    harm caused by invasion of privacy; and

    f.    other uncertain and hard-to-quantify actual damages.

(*See* **Exhibit C**, Counterclaim, ¶ 81).

19.    In Count II – Missouri Subclass' Claim, Kyles alleges that as a result of AFC's failure to comply with the UCC, the Missouri Subclass suffered actual damages, including:

    a.    loss of use of tangible property and cost of alternative transportation;

    b.    loss resulting from the inability to obtain, or increased costs of, alternative financing;

    c.    the surplus after disposition of the collateral that would be equal to the proceeds of disposition less the unaccelerated balance due on the consumer loan contracts and less any wrongfully charged interest;

    d.    all monies paid to [AFC] by Kyles and the Missouri Subclass for the time price differential and delinquency and collection charges on the consumer credit contracts;

    e.    harm to credit worthiness, credit standing, credit capacity, character, and general reputation;

    f.    harm caused by slander and libel;

    g.    harm caused by invasion of privacy; and

    h.    other uncertain and hard-to-quantify actual damages.

(*See* **Exhibit C**, Counterclaim, ¶ 90).

20.    On July 12, 2019, Kyles filed a Motion for Class Certification and Suggestions in Support. (*See generally*, the Court's Docket in Case No. 15SL-AC29334-01). On November 5, 2019, the Circuit Court of St. Louis County entered its Order granting Kyles' Motion for Class Certification and appointing Kyles as the class representative (the "Order Certifying Class"). (*See* **Exhibit D**, Order Certifying Class). The Order Certifying Class includes a section titled "Facts for Class Certification," which states:

Kyles obtained financing through Lou Budke for the purchase of a car (consumer good covered by the UCC). After he defaulted, Lou Budke

mailed Kyles a right-to-cure notice informing him he was in default and his car could be repossessed. He did not cure the default, so Lou Budke repossessed the car. Then Lou Budke mailed a form presale notice to Kyles advising him of its intent to dispose of the repossessed car in purported compliance with the UCC. Kyles did not redeem the car, so Lou Budke sold it and sent Kyles a form post-sale notice explaining how it calculated the deficiency balance.

Lou Budke sued Kyles for the deficiency balance after selling his car. Kyles counterclaimed, alleging Lou Budke violated statutory provisions governing its form UCC notices. The same UCC notices mailed to Kyles were mailed to each class member. Missouri Department of Revenue records show there are at least 618 potential class members.

(*See* **Exhibit D**, Order Certifying Class).

21. The presale and post-sale notices sent by AFC, which Kyles and the Class complain violate state statute and the UCC, were not mailed by AFC until after it repossessed the automobiles of those individuals (i.e., the Class) alleged to be in default of their Retail Installment Sales Contracts. (*See* **Exhibit B**, AFC Petition; **Exhibit C**, Counterclaim; **Exhibit D**, Order Certifying Class).

22. Between October 23 and 30, 2023, Kyles, on behalf of himself and the Class, AFC, and their respective counsel executed a settlement agreement. (*See* **Exhibit A-1**).

23. The settlement agreement included the following terms:

1.25 **Total Class Benefit**. "Total Class Benefit" means the quantifiable benefits conferred upon the Class, including the Cash Fund of $185,000.00, the Gross Deficiency Write-Off Amount, which Lou Budke currently estimates as in excess of $850,000.00, and benefits conferred by Paragraph 3.11 for a Total Class Benefit exceeding $4,850.000.

…

2.1 **Class**. The "Class" means all persons to whom Lou Budke mailed a presale notice or post-sale notice.

2.2 **Exclusions**. Excluded from the Class are all persons whom Lou Budke has obtained a final deficiency judgment or who filed for bankruptcy after the date on their presale notice and whose bankruptcy ended in discharge rather than dismissal.

7

…

3.10    **Write-Off to Class Members' Account Balances or Lou Budke's Deficiency Claims.**  The original amount and enforceability of the alleged deficiency balances outstanding on each Class Member's account is disputed in good faith.  As a result of this good-faith dispute, Lou Budke shall write-off all deficiency balances on the loans associated with the allegedly defective presale and post-sale notices for the Class Members.  The write-off of deficiencies shall operate to reduce the alleged obligations of the Class Members to zero.  The Class shall be specifically informed by way of the notice to the class ("Class Mail Notice") of the potential tax consequences of the proposed settlement.

Promptly upon the Effective Date of the Agreement, Lou Budke will, regarding all Class Members, close all accounts that are the subject of the Litigation and write off any remaining deficiency balances then owed or claimed remaining as of the Effective Date on the Class Members' collateralized loans, as of the Effective Date and will cease all collections and attempts to collect monies regarding said closed accounts and written off balances.  Upon Preliminary Approval being granted, Lou Budke shall not accept payments on Class Members' deficiency balances and will return any payment received by returning the payment instrument to the sender.  If final approval is not granted, all collections on the closed accounts and written off balances after the date of Preliminary Approval shall be retained by Lou Budke.  Lou Budke estimates the Deficiency Write-Off and all account balances and deficiency claims written off under the terms of this Agreement exceeds $850,000.00 and shall be included as part of the Total Class Benefit.

3.11    **Credit Reporting by Lou Budke.**  After the Effective Date, Lou Budke will cease reporting to the national credit reporting agencies (Experian, Equifax, TransUnion, and Innovis) (the "Credit Bureaus") there is any amount due or owing from the Class Members on the loans that are the subject of this Settlement.  Within 30 days after the Effective Date, Lou Budke will submit to the Credit Bureaus, through an electronic file, a request to delete the trade line for each loan that is the subject of this Settlement. …

…

3.14    **Judgment**.  Notwithstanding anything to the contrary, Lou Budke will not contest a judgment being entered against it in an amount to be determined by the Court, comprising damages for wrongful possession, libel/slander/defamation, invasion of privacy, and other uncertain or hard to quantify damages, plus pre-judgment interest and post-judgment interest.  Kyles will seek a judgment equal to the statutory damages provided in § 9-625, the time price differential ("finance charge") paid by the Class, plus prejudgment interest and post-judgment interest.  Other than the $185,000 to be paid by Lou Budke, the judgment shall indicate nothing may be satisfied from Lou Budke's assets for its obligations required under this Agreement

and any remaining amount may only be satisfied from Lou Budke's insurers, insurance agents, or insurance brokers. The judgment may not be satisfied from attaching or otherwise acquiring other assets of Lou Budke or Lou Budke's officers, directors or shareholders. Lou Budke will cooperate with Kyles in obtaining the judgment, including waiving its rights to: (1) a jury trial; (ii) present evidence; (iii) object to evidence; (iv) question witnesses called by Kyles; (v) make argument to the Court in opposition to Kyles' arguments; and (vi) appeal any decision or judgment of the Court.

Notwithstanding anything to the contrary, Lou Budke will assign to the Class all its claims and rights against its insurers, insurance agents and brokers who issued policies in effect during the class period, including without limitation, any claims of bad faith failure to settle and breach of the duty to defend. If the Court grants final approval, then the Class may pursue claims against insurers to recover the judgment. Lou Budke agrees to cooperate in the collection efforts against the insurers, insurance agents and brokers.

The Class Members shall receive the funds remaining from any recovery from the insurers or insurance agents and bankers after any court-approved attorney's fees and costs are deducted.

…

5.2   **Known and Unknown Claims**. The Releasors acknowledge and agree that they know they may discover material or immaterial facts besides or different from those which they now know or believe to be true regarding the subject matter of the Release, but they intend to and do, upon the Effective Date of the Agreement, fully, finally and forever settle and release each and every of the Released Persons from every Released Claim, known or unknown, suspected or unsuspected, accrued or not accrued, contingent or matured, which now exists, may exist, or may heretofore have existed, without regard to the subsequent discovery or existence of such different or additional facts.

(*See* **Exhibit A-1**).

24.   The Circuit Court of St. Louis County entered a Preliminary Approval Order on November 27, 2023. (*See* Preliminary Approval Order, attached as **Exhibit E**).

25.   The Circuit Court of St. Louis County subsequently entered a Final Approval Order and Final Judgment on April 16, 2024. (*See* Final Approval Order, attached as **Exhibit F**; Final Judgment, attached as **Exhibit G**).

9

## THE POLICIES

26.     Mesa issued a commercial garage policy bearing Policy Number MP0024001001695 to Arrow Finance Company, Inc. ("Arrow Inc."), which was in effect for the policy period beginning January 16, 2015, and ending January 16, 2016 (the "2015 Policy"). A true and accurate copy of the 2015 Policy is attached hereto as **Exhibit H**.

27.     The 2015 Policy issued to Arrow Inc. was subsequently renewed without lapse for each annual policy period through January 16, 2023. (January 16, 2016 to January 16, 2017 Policy ("2016 Policy"), attached as **Exhibit I**; January 16, 2017 to January 16, 2018 Policy ("2017 Policy"), attached as **Exhibit J**; January 16, 2018 to January 16, 2019 Policy ("2018 Policy"), attached as **Exhibit K**; January 16, 2019 to January 16, 2020 ("2019 Policy"), attached as **Exhibit L**; January 16, 2020 to January 16, 2021 ("2020 Policy"), attached as **Exhibit M**; January 16, 2021 to January 26, 2022 ("2021 Policy"), attached as **Exhibit N**; January 16, 2022 to January 26, 2023 ("2022 Policy"), attached as **Exhibit O**). All of the policies issued to Arrow Inc. as referenced herein are collectively referred to as the "Policies."

28.     The Policies each contain a Garage Coverage Form, which includes Liability Coverage. The 2015 Policy was issued with Garage Coverage Form CA00051001, while the rest of the Policies (2016 Policy to 2022 Policy) were issued with Garage Coverage Form CA00050310. (*See* **Exhibits H-O**, Schedule of Forms and Endorsements).

29.     Under the Policies, "you" refers to the Named Insured, Arrow Inc. (*See* **Exhibits H-O**, Garage Coverage Form at page 1).

30.     The Policies have the same insuring agreement for Liability Coverage in the Garage Coverage Form (including that with Garage Coverage Form CA00051001 and those with Garage Coverage Form CA00050310). The liability insuring agreements state, in part:

**SECTION II – LIABILITY COVERAGE**
**A. Coverage**

10

    **1.** **"Garage Operations" – Other Than Covered "Autos"**
        **a.** We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies caused by an "accident" and resulting from "garage operations" other than the ownership, maintenance or use of covered "autos". …

(*See* **Exhibits H-O**, Garage Coverage Form at page 2).

    31.    The Policies define "'insured' for 'garage operations' other than covered 'autos' as "**(1)** You. **(2)** Your partners (if you are a partnership), members (if you are a limited liability company), 'employees', directors or shareholders but only while acting within the scope of their duties." (*See* **Exhibit H-O**, Garage Coverage Form at page 3).

    32.    The Policies have "Exclusions" in the Garage Coverage Form that are applicable to Liability Coverage, including for "Expected Or Intended Injury" and for "Loss Of Use", as follows:

    **B. Exclusions**
    This insurance does not apply to any of the following:
    **1. Expected Or Intended Injury**
        "Bodily injury" or "property damage" expected or intended from the standpoint of the "insured". But for "garage operations" other than covered "autos" this exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

    [ . . . ]

    **14. Loss Of Use**
        Loss of use of other property not physically damaged if caused by:
        **a.** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

(*See* **Exhibits H-O**, Garage Coverage Form at pages 4, 7).

    33.    The Policies have "Definitions" in the Garage Coverage Form that are applicable to Liability Coverage, including the following terms:

    **SECTION VI – DEFINITIONS**
    **A.** "Accident" includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage".

    [ . . . ]

    **C.** "Bodily injury" means bodily injury, sickness or disease sustained by a person including death resulting from any of these.

    [ . . . ]

    **H.** "Garage operations" means the ownership, maintenance or use of locations for garage business and that portion of the roads or other accesses that adjoin these locations. "Garage operations" includes the ownership, maintenance or use of the "autos" indicated in Section **I** of this coverage form as covered "autos". "Garage operations" also include all operations necessary or incidental to a garage business.

    [ . . . ]

    **L.** "Loss" means direct and accidental loss or damage. But for Garagekeepers Coverage only, "loss" also includes any resulting loss of use.

    [ . . . ]

    **O.** "Property damage" means damage to or loss of use of tangible property.

(*See* **Exhibits H-O**, Garage Coverage Form at pages 15-17).

    34.    The definition of "bodily injury" is modified in the 2015 Policy by the Additional Exclusions and Provisions Garage Insurance endorsement to be defined as follows:

    **C.** "Bodily injury" means physical injury, sickness, or disease sustained by a person including death resulting from any of these. "Bodily injury" does not include emotional distress, mental anguish, humiliation, mental distress, mental injury, anxiety, inconvenience, depression, dissatisfaction, or shock to the nervous system or any physical manifestation of any of the forgoing [sic], or any similar injury unless it arises out of other actual physical injury to that person.

(*See* **Exhibit H**, Endorsement MUS 01 01 70002 0314).

    35.    The definition of "bodily injury" is modified in the 2016 Policy, 2017 Policy, 2018 Policy, 2019 Policy, 2020 Policy, 2021 Policy, and 2022 Policy by the Additional Exclusions and Provisions Garage Insurance endorsement to be defined as follows:

    **C.** "Bodily injury" means physical injury, sickness, or disease sustained by a person including death resulting from any of these. "Bodily injury" does not include emotional distress, mental anguish, humiliation, mental distress, mental injury, anxiety, inconvenience, depression, dissatisfaction, or shock to the nervous system or any similar injury, including physical manifestation of any of the forgoing [sic], unless arising out of other underlying actual physical injury to that

person.

(*See* **Exhibit I**, Endorsement MUS 01 01 70002 0515; **Exhibits J-L**, Endorsement MUS 01 01

70002 0916; **Exhibits M-O**, Endorsement MUS 01 01 70002 0919).

36.     The 2015 Policy includes endorsement CA25071293, titled "Locations and

Operations Not Covered," which endorsement modifies the 2015 Policy's Garage Coverage Form,

including its Liability Coverage.    (*See* **Exhibit H**, 2015 Policy, Schedule of Forms and

Endorsements; Endorsement CA25171293).  The endorsement states, in part:

> **Locations and Operations Not Covered:**
> REPOSSESSION

(*See* **Exhibit H**, 2015 Policy, Endorsement CA25071293).

37.     On March 29, 2017, through endorsement MUS0101100060412, Mesa added

endorsement MUS0101700200515, titled "Designated Products Or Operations Exclusion," to the

2017 Policy, with an effective date of January 16, 2017 (the inception date of the 2017 Policy).  (*See*

**Exhibit P,** Endorsement MUS0101100060412 and Endorsement MUS0101700200515, collectively

attached.  The endorsement modifies the Garage Coverage Form, including its Liability Coverage.

The endorsement states, in pertinent part:

> This insurance does not apply to:
> "Loss", "bodily injury" or "property damage" arising from or contributed to in
> any way by the designated products or operations listed below:
> EXCLUDING ANY ACT OF REPOSSESSION INCLUDING WRONGFUL
> REPOSSESSION.

(*See* **Exhibit P**, Endorsement MUS0101100060412 and Endorsement MUS0101700200515).

38.     The 2018 Policy includes endorsement MUS0101700200515, titled "Designated

Products Or Operations Exclusion."    (*See* **Exhibit K**, 2018 Policy, Schedule of Forms and

Endorsements).    The endorsement modifies the Garage Coverage Form, including its Liability

Coverage.  The endorsement states, in pertinent part:

> This insurance does not apply to:

"Loss", "bodily injury" or "property damage" arising from or contributed to in any way by the designated products or operations listed below:
REPO:  ARISING FROM OR CAUSED BY ANY ACT OF REPOSSESSION INCLUDING WRONGFUL REPOSSESSION.

(*See* **Exhibit K**, 2018 Policy, Endorsement MUS 01 01 70002 0515).

39.    The 2015 Policy, 2016 Policy, 2017 Policy, 2018 Policy, and 2019 Policy include the endorsement titled "Additional Exclusions and Provisions Garage Insurance."  (*See* **Exhibits H-L**, Schedule of Forms and Endorsements).  The endorsement modifies Section II - Liability Coverage, B. Exclusions to include the following exclusion to which "[t]his insurance does not apply …":

**Transfer of Ownership or Surrender of Possession**

"Bodily injury" or "property damage" occurring after possession of an "auto" has been surrendered to another person pursuant to sale, conditional sale, gift, abandonment, or lease.

(*See* **Exhibit H**, Endorsement MUS 01 01 70002 0314; **Exhibit I**, Endorsement MUS 01 01 70002 0515; **Exhibits J-L**, Endorsement MUS 01 01 70002 0916).

40.    The 2020 Policy, 2021 Policy, and 2022 Policy include endorsement MUS 01 01 70002 0919, titled "Additional Exclusions and Provisions Garage Insurance."  (*See* **Exhibits M-O**, Schedule of Forms and Endorsements).  The endorsement modifies Section II - Liability Coverage, B. Exclusions to include the following exclusions to which "[t]his insurance does not apply …":

**Repossession**

"Bodily injury" or "property damage" caused by, arising out of or resulting from any act of repossession, including wrongful repossession.

…

**Transfer of Ownership or Surrender of Possession**

"Bodily injury" or "property damage" occurring after either ownership of an "auto" is transferred or possession of an "auto" is surrendered to another person pursuant to sale, conditional sale, gift, abandonment, or lease.

(*See* **Exhibits M-O**, Endorsement MUS 01 01 70002 0919).

14

41.    Each of the Policies includes a $500 per accident deductible that is required to be reimbursed if any claim is paid.  (*See* **Exhibits H-O** at Form CA 03 02 03 06).

**COUNT I**
**Declaratory Judgment**
**(All Policies, Insuring Agreement)**

42.    Mesa incorporates herein by reference Paragraphs 1-41 as if fully stated herein, *in haec verba*.

43.    There is no duty for Mesa to defend or indemnify any claim in the Counterclaim because AFC is not the Named Insured or an insured under the Garage Coverage Form; Arrow Inc. is.

44.    There is no duty for Mesa to defend or indemnify any claim in the Counterclaim, because the Counterclaim does not allege any damages because of "bodily injury."

45.    There is no duty for Mesa to defend or indemnify any claim in the Counterclaim, because the Counterclaim does not allege any claim for which Mesa may be legally obligated to pay damages because of "property damage."

46.    There is no duty for Mesa to defend or indemnify any claim in the Counterclaim, because the Counterclaim does not allege any claim for which Mesa may be legally obligated to pay damages that were caused by an "accident."

47.    There is no duty for Mesa to defend or indemnify any claim in the Counterclaim, because the Counterclaim does not allege any claim for which Mesa may be legally obligated to pay damages for "property damage" caused by an "accident" and resulting from "garage operations."

48.    There is no other basis under the insuring agreements for Section II – Liability Coverage in the Garage Coverage Forms of the Policies according to which AFC (or Arrow Inc.) could be entitled to defense or indemnity in connection with the Counterclaim.

49.    For all the reasons above, Mesa has no duty to defend or indemnify AFC (or Arrow

Inc.) in the Counterclaim.

50.    For all the reasons above, an actual controversy exists between the parties, which vests in this Court the power to declare the rights and liabilities of the parties.

**COUNT II**
**Declaratory Judgment**
**(All Policies, Exclusions)**

51.    Mesa incorporates herein by reference Paragraphs 1-50 as if fully stated herein, *in haec verba*.

52.    Even if there were "bodily injury" or "property damage" caused by an "accident" and resulting from "garage operations," which Mesa denies, there is no duty for Mesa to defend or indemnify AFC (or Arrow Inc.) under the Policies for any allegation or claim in the Counterclaim because the "Expected Or Intended Injury" exclusion applies to bar coverage to AFC (and Arrow Inc.) in that the only allegations against AFC (or Arrow Inc.) for damages sustained by Class members arise from AFC's (or Arrow Inc.'s) intentional acts, the results of which were expected or intended, to wit:

a.    Any breach of the Retail Installment Sales Contract by AFC (or Arrow Inc.) was an intentional act and resulted in damages to Class members that were expected and/or intended; and

b.    AFC's (or Arrow Inc.'s) repossession of automobiles from Class members was an intentional act and resulted in damages to Class members that were expected and/or intended.

53.    Even if there were "property damage" caused by an "accident" and resulting from "garage operations," which Mesa denies, there is no duty for Mesa to defend or indemnify AFC (and Arrow Inc.) under the Policies for any allegation or claim in the Counterclaim because the "Loss Of Use" exclusion applies to bar coverage to AFC (or Arrow Inc.) to the extent that the Counterclaim

16

alleges the Class members sustained damages from the loss of use of their automobiles arising from AFC's (or Arrow Inc.'s) wrongful, unlawful, or incorrect repossession of automobiles under the terms of the Retail Installment Sales Contract.

54.     Even if there were "bodily injury" or "property damage" caused by an "accident" and resulting from "garage operations," which Mesa denies, there is no duty for Mesa to defend or indemnify AFC (or Arrow Inc.) under the Policies for any allegation or claim in the Counterclaim because the "Transfer of Ownership or Surrender of Possession" exclusion applies to any allegations of the Counterclaim involving the surrender of an "auto," including by abandonment.

55.     Even if there were "bodily injury" or "property damage" caused by an "accident" and resulting from "garage operations," which Mesa denies, there is no duty for Mesa to defend or indemnify AFC (or Arrow Inc.) under the 2020 Policy, 2021 Policy, and 2022 Policy for any allegation or claim in the Counterclaim because of the Repossession Exclusion in that all claims arise out of or result from any act of repossession, including wrongful repossession.

56.     For all the reasons above, Mesa has no duty to defend or indemnify AFC (or Arrow Inc.) in the Counterclaim.

57.     For all the reasons above, an actual controversy exists between the parties, which vests in the Court the power to declare the rights and liabilities of the parties.

## COUNT III
### Declaratory Judgment
### (2015 Policy, Endorsement CA25071293, "Locations And Operations Not Covered")

58.     Mesa incorporates herein by reference Paragraphs 1-57 as if fully stated herein, *in haec verba*.

59.     Even if there were "bodily injury" or "property damage" caused by an "accident" and resulting from "garage operations," which Mesa denies, there is no duty for Mesa to defend or indemnify any claim in the Counterclaim, in that the only allegations against AFC (or Arrow Inc.)

17

for damages sustained by Class members arise from AFC's (or Arrow Inc.'s) repossession of Class members' automobiles.

60.    For all the reasons above, Mesa has no duty to defend or indemnify AFC (or Arrow Inc.) in the Counterclaim.

61.    For all the reasons above, an actual controversy exists between the parties, which vests in the Court the power to declare the rights and liabilities of the parties.

**COUNT IV**
**Declaratory Judgment**
**(2017 Policy and 2018 Policy, Endorsement MUS0101700200515,**
**"Designated Products Or Operations Exclusion")**

62.    Mesa incorporates herein by reference Paragraphs 1-61 as if fully stated herein, *in haec verba*.

63.    Even if there were "bodily injury" or "property damage" caused by an "accident" and resulting from "garage operations," which Mesa denies, there is no duty for Mesa to defend or indemnify any claim in the Counterclaim, in that the only allegations against AFC (or Arrow Inc.) for damages sustained by Class members arise from AFC's (or Arrow Inc.'s) repossession of Class members' automobiles.

64.    For all the reasons above, Mesa has no duty to defend or indemnify AFC (or Arrow Inc.) in the Counterclaim.

65.    For all the reasons above, an actual controversy exists between the parties, which vests in the Court the power to declare the rights and liabilities of the parties.

**COUNT V**
**Declaratory Judgment**
**(Deductible)**

66.    Mesa incorporates herein by reference Paragraphs 1-65 as if fully stated herein, *in haec verba*.

67.    Even if there were "bodily injury" or "property damage" caused by an "accident"

and resulting from "garage operations" that was not otherwise excluded, which Mesa denies, settlement class member's claim within any policy period represents a different accident subject to a $500 deductible.

68.    For all the reasons above, Mesa would be entitled to reimbursement to the extent it had any duty to defend or indemnify AFC (or Arrow Inc.) in the Counterclaim.

69.    For all the reasons above, an actual controversy exists between the parties, which vests in the Court the power to declare the rights and liabilities of the parties.

**WHEREFORE**, Plaintiff Mesa Underwriters Specialty Insurance Company respectfully requests that this Court:

(a)    Enter an order finding that Mesa has no duty to defend AFC (or Arrow Inc.) in the Counterclaim; and

(b)     Enter an order finding that Mesa has no duty to indemnify AFC (or Arrow Inc.) against any settlement or judgment that may be entered on the Counterclaim;

(c)    Enter an order finding that Mesa never had a duty to defend or indemnify AFC (or Arrow Inc.) in the Counterclaim; and

(d)    Provide such other and further relief as this Court deems just and proper in the premises.

Dated:  May 17, 2024.

4892-5457-3239

Respectfully submitted,

*/s/ Meredith A. Webster*

Meredith A. Webster                    #63310MO
KUTAK ROCK LLP
2300 Main Street, Suite 800
Kansas City, MO 64108
(816) 960-0090 Telephone
(816) 960-0041 Facsimile
Meredith.Webster@kutakrock.com

and

Jeffrey W. Coffey                    #69045MO
KUTAK ROCK LLP
300 John Q Hammons Parkway, Suite 800
Springfield, MO 65806
(417) 720-1410 (Telephone)
(417) 720-1411 (Facsimile)
Jeff.Coffey@KutakRock.com

**ATTORNEYS FOR MESA
UNDERWRITERS SPECIALTY
INSURANCE COMPANY**